ACQUACKANONK WATER COMPANY, EAST JERSEY WATER COMPANY, KEARNEY WATER COMPANY, MONTCLAIR WATER COMPANY AND PASSAIC WATER COMPANY, PROSECUTORS, v. BOARD OF PUBLIC UTILITY COMMISSIONERS, DEFENDANT.

CITY OF BAYONNE, PROSECUTOR, v. BOARD OF PUBLIC UTILITY COMMISSIONERS, DEFENDANT.

TOWN OF MONTCLAIR, PROSECUTOR, v. BOARD OF PUBLIC UTILITY COMMISSINERS, DEFENDANT.

Argued June 7, 1923—Decided November 15, 1923.

**Public Utilities—Valuation for Rate Making—Properties of Interrelated Companies Valued Together—Method of Fixing Value Considered—Items of Value Included.**

On writs of *certiorari*.

Before Justices TRENCHARD and PARKER.

For the Acquackanonk Water Company. East Jersey Water Company, Kearney Water Company, Montclair Water Company and Passaic Water Company, *John B. Humphreys, William M. Wherry* (of the New York bar) and *L. Edward Herrmann.*

For Bayonne, *Aaron A. Milniker, Eugene T. Sharkey* and *Treacy & Milton.*

For Montclair *Walter E. Marsden* and *Theodore J. Badgley.*

For the Board of Public Utility Commissioners, *Thomas Brown.*

PER CURIAM.

These are three writs of *certiorari* allowed, one to the several water company prosecutors, one to the city of Bayonne and one to the town of Montclair, for the purpose of reviewing water rates fixed by the order of the board of public utility commissioners of March 27th, 1923.

It appears that the water companies posted a new schedule of rates in February, 1922. The board enjoined their putting it into effect and ordered a hearing. At the hearing the board decided that the East Jersey Water Company was not a public utility and excluded it from the proofs. On *certiorari* it was decided that it was a public utility within the meaning of the statute, and the order refusing to consider the application was set aside. *Acquackanonk Water Co. v. Board of Public Utility Commissioners,* 118 *Atl. Rep.* 535; *affirmed,* 119 *Id.* 679, under another name. The companies then filed an amended schedule. It was apparently based on the proposition, and was heard, considered and decided upon the theory that the whole group of water companies was so intertwined by ownership and operation that it would be considered in substance as one concern supplying all the municipalities, and the valuation of the property determined in the aggregate and the rates determined upon the basis of cost of supplying the various municipalities served.

We do not see how the matter could reasonably have been handled in any other way.

Treating the matter in this way the question turns upon the gross valuation of the entire system.

The board fixed the gross valuation at $11,500,000. The municipalities contend that such valuation is too high; the companies that it is too low.

The first point made by the water companies is that the board erroneously reduced the value of the property by excluding one-half of the value of the Kikeout reservoir. But the evidence shows that such reservoir property is a mere site, not useful or used at all in supplying water at present, and possibly never may be. The complaint which the companies make is that only one-half the value of this reservoir was taken in consideration. Under the circumstances as disclosed by the evidence the allowance of one-half its value was all the prosecutor is entitled to, and is, we think, unobjectionable from any point of view.

The next point is that the value of water rights was not considered in determining the value upon which the rates were predicated. But the board reported that they had considered the vair value of the property upon which the rates should be predicated, including all physical and intangible elements, working capital, cost of organization, going concern, &c. And under the headings "Water Power Rights" and "Water Diversion Rights" the board said: "These rights are undoubtedly of great value, and while it is true that the same parties interested in these water companies are also interested in the water power rights, water power developments were in operation for many years before the organization of the water companies, and the contracts for the diversion of the water appear to have been originally made in good faith, and have never been questioned. In view of all the facts the board concludes that the valuation of these water rights on the basis of their purchase price is proper for present value." This we think sufficiently shows that they were included. It is argued that since the costs of water rights are not specifically enumerated, they are therefore excluded. But we do

37

not think that follows: The board has certified in effect that it considered all physical and intangible elements and that the total value was $11,500,000.

The next point made by the companies is that the board considered matters not of evidential character in determining the value of the property. This is directed against the statements of valuation made by three of the expert witnesses, and particularly against that of Dr. Bemis. It seems to us that they were evidential, the board by the express language of the statute, not being limited by strict rules of evidence. It was endeavoring to find out the value of these properties and had a right to take into account the statements of value submitted by the witnesses in connection with their testimony. It would be almost impossible to carry in mind all these different figures without some sort of tabulation.

It is next urged that the statements of Dr. Bemis were not of present value. But the character of the evidence was before the board. And, moreover, apparently, considering its findings, it did not accept the values of Dr. Bemis.

The next point made is that it was improper for the board to *consider* the price at which the owners had offered to sell the property. We think this was proper evidence because it indicated the value placed upon the property by its owners, but which, however, the board did not adopt because it placed upon the property a value of about one million dollars above what the owners offered to sell it for.

The next point made is that the board did not make specific findings. We think it did so sufficiently in view of the fact that there was a combination of these companies and it was apparently impossible to separate them.

The next point is that the board refused to consider federal income taxes paid as an operating deduction. But the Supreme Court of the United States in *Galveston Electric Co.* v. *Galveston,* 258 *U. S.* 388, disposed of this point contrary to the claim of the companies. In that case the master allowed the federal income tax as a cost of operation, and the District Court disallowed it, and the later action was sustained by the Supreme Court, saying: "But the fact that

it is the federal corporate income tax for which deduction is made must be taken into consideration in determining what rate of return shall be deemed fair. For under section 216 the stockholder does not include in the income on which the normal federal tax is payable dividends received from the corporation. This tax exemption is therefore, in effect, part of the return on the investment."

The next point made is that the report does not take into consideration the increase in taxes which concern the companies. But what the board did was to take into account the taxes for 1922, the time of the hearing before the board. To go beyond that the board would have to speculate, and that we think it certainly was not obliged to do.

The next point is that the board was in error in not taking into account the deficiency in earnings caused by the action of the board in preventing the companies from obtaining adequate rates during the litigation through its order suspending the posted rates. But the companies were collecting all the rates they were entitled by law to collect, and the board would not have been justified in undertaking to make up any such deficiencies. Moreover, no claim of this sort · was made at the hearing so far as we can find.

We, therefore, find no reason in the points of the companies for setting aside the order.

Nor do we find any of the points made by the municipalities sufficient to disturb the order.

The city of Bayonne contends that the rates fixed for that city are excessive, and that the value put upon the property was excessive and refers to a lower appraisal made by the state in 1912. But there has been, we think, an increase in the value (as with most properties) since that date, and certainly there is nothing in the evidence which justifies a present value on the basis of the appraisal of 1912. Upon the whole evidence we cannot say that the valuation was too high.

The next point Bayonne makes is that it was error to make an allowance for going concern value. But the de-

cisions are to the contrary. *Public Service Co. v. Public Utility Board,* 84 *N. J. L.* 463; affirmed, 87 *Id.* 581. There seems to be no substantial dispute concerning the amount for going concern value, but the contention seems to be that it ought to have been excluded. In any event we find no reason in this point for setting aside the order.

The next point Bayonne makes is that the allowance by the board of $900,000 per annum, yielding approximately eight per cent., is excessive. From what we have said we have sufficiently indicated that we do not think it excessive.

Bayonne contends that the Washington and Beall contract with the city is invulnerable and the city cannot be compelled to pay more than that contract provides. But contracts between cities and water companies cannot prevail against an order of the board. *Hackensack Water Co. v. Board,* 115 *Atl. Rep.* 531.

Upon the whole, we see nothing in the points made by Bayonne that justifies any interference with the order of the board.

The town of Montclair contends that it is required to pay returns upon property not used by it.

It first argues that at one time the water companies, through the mains of Montclair, served West Orange, Bloomfield and Glen Ridge, and that these towns are no longer supplied, and therefore the board had no right to take into consideration the value of the increased size of the Montclair mains. But it is not denied that these mains are now used to supply water to Montclair.

Another point Montclair makes is that the meter charges made by the board are excessive. In other words, it says that certain meters are valued at $9.75, and that because the board fixed the rate at $6 a year, which is thirty-three per cent. of the cost of the meter, the charge is excessive. But there is something besides the cost of the meter to be considered; it requires labor to put it in, keep it in order, and to have it read monthly.

The next point is that the fire hydrant charges for the town are too high. But the rate is based on what is called the inch-foot basis, to which the town has no objection, but contends that the increase will be seventy-five per cent. and that it is exorbitant. We cannot say that it is. The matter of fire hydrants is entirely distinct from house service, and, of course, requires more water in case of fire, and service to take care of them. The matter is not without its difficulties; but we cannot say that the board was wrong in this.

The order will be affirmed.